MARY DUNN AND OTHERS *vs.* W. C. DUNN, TRUSTEE, AND
OTHERS.

The trustee of A., a married woman, having money which he held for her sole
  and separate use for life, "without being liable for the debts, contracts or
  liabilities of her husband," with remainder to her issue, with her consent,
  loaned the money, in 1853, to her husband, without security, but took from
  the husband a mortgage of slaves, to indemnify him, the trustee, against
  loss. In 1862, some of the slaves were sold, and the trustee received, under
  the mortgage, the proceeds in Confederate money, which he retained un-
  til it became valueless. Other of the slaves remained in the husband's pos-
  session until they were emancipated. A. had no power, under the instru-
  ment creating the trust, to consent to the loan: *Held,* That the trustee com-
  mitted a breach of trust, which made him liable to A., when he loaned the
  money without security; and that he was not entitled to an allowance on
  his accounts, either for the Confederate money which he received, or for the
  value of the slaves which remained in the husband's possession.
Before the adoption of the Constitution of 1838, it was a breach of trust for the
  trustee of a married woman to loan money which he held for her separate
  use to her husband, without security, and her consent made no difference,
  unless she had power to consent by the terms of the trust.

BEFORE THOMAS, J., AT UNION, AUGUST TERM, 1869.

By a decree of the Court of Equity for Union District, (now
County,) made by Chancellor Dunkin, July 6, 1853, the defendant,
W. C. Dunn, was appointed trustee of the plaintiff, Mary Dunn,
then and now the wife of Henry G. Dunn. Certain lands, in which
she had a separate estate, were directed to be sold by the Commis-
sioner; and it was further ordered, that the proceeds of the sale
"shall be held by the said W. C. Dunn (with leave to apply for
directions as to investment) in trust for the sole and separate use
and benefit of Mrs. Mary Dunn, (the plaintiff,) during her life,
without being liable for the debts, contracts or liabilities of her
present, or any future husband, and, at her death, to be divided
among her issue then living, according to the statute of distributions."

The bill, in this case, was exhibited by Mary Dunn and her two
daughters, with their husbands, against W. C. Dunn, the trustee,
and Henry G. Dunn, the husband of the plaintiff, Mary. The ob-
ject of the bill was to obtain an account of the trust funds which
W. C. Dunn received under the said decree.

The defendant, W. C. Dunn, by his answer, stated : That the
sum of $3,969.89 was realized from the sales of the lands ; that,
"with the view of meeting the wishes of the beneficiaries of the
fund," he, the defendant, on the 14th day of February, 1856, au-
thorized and permitted Henry G. Dunn, the husband of the plain-

tiff, Mary Dunn, to receive the said sum from the Commissioner of the Court; and, on the same day, took from him, the said Henry G. Dunn, a mortgage of eight slaves, "for the better securing and indemnifying the said William C. Dunn," as the mortgage declared, "for, and on account of, any liability or damages he may sustain, or that he may be in danger of sustaining, from any act or omission, on my part, in not accounting and paying over to the parties aforesaid in interest," (the plaintiff, Mary Dunn, and her children,) "or their legal representatives, their portions of the said fund, according to the terms and conditions of the order and decree" of the Court touching the same, and conditioned for the doing and performing, well and truly, by Henry G. Dunn, of every thing required of the said W. C. Dunn, "as trustee as aforesaid, in regard to said fund;" that all the slaves remained in the possession of the mortgagor until 1862, when five of them were sold by the Sheriff under executions; and that, after satisfying some older liens, the Sheriff paid to the respondent, on his mortgage, the sum of $3,223.25 in Confederate treasury notes, being the balance of the proceeds of the sales; that, "owing to the unsettled state of the country, and the uncertainty and insecurity of all investments," the respondent declined to invest the said sum of $3,223.25, and retained the same in his hands until it was rendered valueless by the fall of the Confederate Government; and that the three other slaves, upon which he held a lien, under his mortgage, for the balance of the trust fund, were retained by the said Henry G. Dunn, until, by the same event, they ceased to be property.

A good deal of evidence was given or read at the hearing, but, as the Reporter has not been furnished with a copy, he is unable to state what it was.

His Honor decided that the statements contained in the answer were sustained by the evidence; that the lending of the money to Henry G. Dunn was at the instance of the plaintiff, Mary Dunn; and he dismissed the bill.

The plaintiffs appealed, upon the grounds *inter alia:*

1. That, from the case made by the pleadings and evidence, the plaintiffs were entitled to an account of the trust funds which came to the hands of the trustee.

2. That the trustee had no authority to invest the trust funds without the direction of the Court.

3. That there was no investment of the trust funds, the money

having been loaned to the husband of the *cestui que trust,* upon security taken to indemnify the trustee.

*Arthur & Steedman,* for appellants, cited Hill on Trustees, 370, 378, 382; *Ison* vs. *Ison,* 5 Rich. Eq., 15; *Barksdale* vs. *Hall,* 13 Rich. Eq., 180.

*Bobo,* contra, cited *Boggs* vs. *Adger,* 4 Rich. Eq., 410; *Taveau* vs. *Ball,* 1 McC. Ch., 461; *Bryan* vs. *Mulligan,* 2 Hill Ch., 364; *Glover* vs. *Glover,* McMul. Eq., 153; *Odell* vs. *Young,* McMul. Eq., 155; 2 Story Eq., § 1272; 1 Vern., 144; *Frazier* vs. *Center & Hall,* 1 McC. Ch., 276; *Fraser* vs. *McPherson & Ford,* 3 Des., 393; *McKnight* vs. *McKnight,* 10 Rich. Eq., 157.

March 28, 1870. The opinion of the Court was delivered by

WILLARD, A. J. The bill seeks to charge W. C. Dunn, as trustee, with a breach of trust. It is filed by Mrs. Dunn and her two daughters, as beneficially interested under the trust. Mrs. Dunn sues by a next friend—her husband, H. G. Dunn, being made a defendant. The daughters, being married, join with their respective husbands. A discovery is prayed against H. G. Dunn, but no relief is sought against him.

The trust estate consisted, originally, of lands devised by the father of complainant, Mary Dunn, upon certain trusts. Upon the application of the complainant, Mary Dunn, to the Court of Equity, an order was made by Chancellor Dunkin, appointing W. C. Dunn, the defendant, the trustee of Mrs. Dunn and her children; also, directing the lands to be sold, and the proceeds to be held by such trustee for the sole and separate use and benefit of Mrs. Mary Dunn, during her life, without being liable for the debts, contracts, or liabilities of her present, or any future husband, and, at her death, to be divided among her issue, then living, according to the statute of distributions; leave was also given to the trustee to apply for directions as to investment.

The proceeds of the sale of the lands under this order were realized by the trustee to the amount of $3,969.89, as admitted by his answer. It further appears, from the answer, that the entire fund was loaned to H. G. Dunn, but the trustee contends that ample security was taken for the loan, and that it was made "with the view of meeting the wishes of the beneficiaries of the fund." The loan to the husband was without security. The trustee alleges otherwise, but the facts set forth by his answer, and the terms of the mortgage,

alleged to be the security taken for the loan, show that his allegation is unsustained.

The mortgage was given by H. G. Dunn, and was of eight slaves. It was a mere obligation to indemnify and save harmless the trustee "from any loss or damage he may sustain, or that he may be in danger of sustaining, from any act or omission" of H. G. Dunn. It was further conditioned upon H. G. Dunn doing and performing, well and truly, everything required of the said W. C. Dunn, "as trustee as aforesaid, in regard to said fund." It neither contained, nor was accompanied by, any obligation or covenant to repay to the trustee the amount loaned. In point of fact, it was an obligation for the personal security of W. C. Dunn, taken upon an understanding that H. G. Dunn should assume all the responsibilities of a trustee, and intended to shield W. C. Dunn from the consequences of any misconduct that might be committed by H. G. Dunn. Such a transaction is a clear breach of trust on the part of the trustee.

But it is said that the complainants concurred in this arrangement, and, therefore, cannot hold the trustee accountable. The answer of the trustee does not explicitly allege the consent or concurrence of either of the complainants. It says that the arrangement, with H. G. Dunn, was made to meet the wishes of the beneficiaries of the fund. What those "wishes" were is left to inference. How the trustee became aware of the wishes of the beneficiaries, whether by communication on their part, or conjecture on his own part, remains uncertain. Whether the children were of full age, unmarried, and capable of binding themselves by their consent, and whether the complainant possessed sufficient knowledge of the facts and circumstances of the case, and of the legal and prudential considerations involved in such disposition, does not appear by the answer.

The testimony introduced by the defendant, W. C. Dunn, at best, can only establish the fact that the beneficiaries desired the trust money to be loaned to H. G. Dunn upon the security of a mortgage of the slaves. But this was not done—the mortgage being a mere personal indemnity for the benefit of the trustee alone. In other respects the facts and circumstances attending the supposed consent of the complainants are left, by the evidence, in almost as great obscurity as that which surrounds the statements of the answer in this respect.

The defendant has failed to establish the charge of concurrence

and consent, on the part of the daughters of Mrs. Dunn, in such manner as to bar them from a remedy for the breach of trust committed by him.

The Circuit Judge has determined that Mrs. Dunn did consent to the loan to her husband; but his decree is silent as to whether her consent contemplated the taking of such security for the trust funds as that afforded by the mortgage.

The consent of Mrs. Dunn could, at most, only affect her life interest in the profits of the fund, but cannot absolve the trustee from liability to restore the *corpus* of the fund for the benefit of those in remainder. But the question here arises whether a married woman can bind herself, by a consent, in regard to her separate estate, so as to be barred from a remedy against her trustee for a breach of trust, by means of which the trust estate has sustained loss. In a case where fraud is not alleged, the effect of the consent of a married woman, in binding the separate estate, must depend on the power she has over that estate. If she cannot charge it, by her direct act, her consent cannot have such effect.

The rule on this subject, as settled in the English Courts, illustrates the proposition advanced. The general rule, there, is, that a married woman cannot bind a trust fund, in which she has a beneficial interest, by her consent, not being *sui juris*. But, in the case of a separate estate, her consent will bind her, for she is treated, in respect to her separate estate, as a *feme sole,* and her consent is allowed the same force as her direct act and deed.—Lewin on Trusts, 775.

It is settled law, in this State, that, without the aid of a Court of Equity, a married woman cannot dispose of, or charge her separate estate, except in the execution of powers conferred by the instrument creating such estate.—*Ewing* vs. *Smith,* 3 DeS. Eq., 417; *Wilson* vs. *Cheshire,* 1 McC. Ch., 233; *Calhoun* vs. *Calhoun,* Rich. Eq. Cases, 36; *Reid* vs. *Lamar,* 1 Strob. Eq., 27. In the present case, the power of the wife must stand on the terms of the order settling the trusts, for the Court will not sanction a loan of the wife's separate estate to her husband without security.

In *Robinson and Wife* vs. *Dart,* (Dudley Eq., 128,) an application by husband and wife, for payment to the husband of a legacy belonging to the wife's separate estate, was refused, notwithstanding the husband offered ample security.

Chancellor Harper says: "When the husband obtains possession of property given to the separate use of the wife, the Court makes

him a trustee for the benefit of his wife; but he has never been constituted a trustee for the purpose of enabling him to' receive the property." The attempt to shift the responsibilities of the trustee, in the case in hand, upon the husband, was a manifest disregard of the intent of the order settling the estate. The terms of the present settlement convey no authority over the separate estate to Mrs. Dunn.

Is the case of a married woman dealing with her separate estate an exception to the general rule, that the validity and effect of an act of concurrence, acquiescence, or release, depends upon the power of the person performing such act over the subject-matter to which it relates? It must be borne in mind that such an act may operate either by way of destroying the right or barring the remedy.

If what is said on this subject, in *Frazier* vs. *Centre*, (1 McC. Ch., 270,) is good law, then the case of a married woman dealing with her separate estate is an exception to such general rule, though upon what ground, within the rule, the exception can stand, is not clear.

Judge Nott says, in that case: "No Court has ever gone so far as to decide that a *feme covert* could not, with the consent of her trustee, vest her own separate funds in any manner which she might think best calculated to promote her interest." This statement clearly involves the idea that a *feme covert* possesses such power. That the case did not rest on the doctrine thus advanced by Judge Nott, is sufficiently clear. In the first place, Chancellor Thompson placed his decree dismissing the bill on two grounds: First, a former determination of the question between the parties; and, second, fraud affecting both the trustee and the *cestui que trust*. Although the appellate Court did not lay stress upon these points, yet it affirmed the Chancellor's decree, without questioning the grounds on which it rested. In the next place, the appellate Court regarded the investment in question as good in itself, standing apart from the consent of the *cestui que trust*. This proposition is summed up in the following language: "In the present case, it was, therefore, proper to lend the money to the husband, and have it secured by a mortgage on the house and lot in question; and there can be no doubt that, at the time, it would have been thought a judicious investment. The loss of Mrs. Frazier, therefore, has not resulted from any fraud of the defendants, Hall and Centre, or misapplication of the funds by the trustee, but from a combination of circumstances, for which they are not answerable." It is worthy of notice that *Fra-*

*zier* and *Centre* was not a question between the trustee and *cestui que trust*, but between the trustee and *cestui que trust*, on the one hand, and strangers, on the other hand. The complainants were seeking to trace trust funds into the purchase of the land, in order to charge the land, as against a purchase money mortgage. Without stopping to consider the soundness of the proposition, that trust moneys may be well secured by a mortgage of previously encumbered lands, it is undeniable that such is the language of the case, leaving the question of the effect of the wife's consent as a matter of scientific interest merely.

We conclude that *Frazier* vs. *Centre* has not judicially determined the point under consideration.

There is no sound reason why this question should not be adjudged on the principles established by *Ewing* vs. *Smith*. That case is good law, though settled on technical grounds. It adheres closely to the rules of the common law, while vindicating powers incidental to trusts, for the benefit of married women. It simply recognizes the fact that the special powers capable of exercise by a married woman, in derogation of the marital rights, as established at common law, rest in grant, and applies the ordinary rules of construction to the terms of the grant, in order to ascertain the nature and limits of such powers. The doctrine of this case fully met the views of the eminently equitable mind of Chancellor Kent, in the *M. E. Church* vs. *Jacques*, 3 John. Ch., 82.

Taking our stand within *Ewing* vs. *Smith*, we discover that the attempt to erect the consent of a married woman into an authority competent to destroy her trust estate, where power has not been lodged in her for that purpose, is an effort to destroy the usefulness of *Ewing* vs. *Smith*, and to confuse the logic of its doctrine. Judge Nott, in *Frazier* vs. *Centre*, did not yield full assent to the soundness of the reasoning on which *Ewing* vs. *Smith* rests, and lost a favorable opportunity for recognizing the legitimate consequences of that decision. The only difference between the deed and the consent of a married woman is, that, in the one case, her act and intention is formally evidenced, while, in the other, it is informal. To deny efficacy to her deed, and allow it to her consent, is to prefer that which is evidenced in a doubtful and disputable manner to that which is clear and unquestioned. Both must rest upon the same foundations—her powers over her separate estate ; and, as to the nature and limitations of those powers, *Ewing* vs. *Smith* is conclusive authority.

*McKnight* vs. *McKnight*, 10 Rich. Eq., 157, does not interfere with this view.

In that case the trust estate consisted of slaves, and it was held that their personal use, in the joint establishment of husband and wife, was consistent with the trusts to her separate use. The view that the Court took left a certain amount of discretion in the wife as to where and when that personal use should be enjoyed, and, to the extent of that discretion, it was not improper to look to the consent of the wife as a source of justification to the trustee. This case is not an authority for allowing to her consent a force that transcends her powers. It is evident, therefore, that, if Mrs. Dunn did consent to a loan of her separate estate to her husband without security, it would not operate to divest her of that estate, for want of power, under the settlement, to dispose of or prejudicially affect that estate.

Could that act operate to bar her remedy against her trustee? This question depends upon her common law powers, there being no allegation of fraud affecting her action, and the answer is, that her release, not being efficacious, in consequence of coverture, her acts of concurrence or acquiesence are equally powerless to bar her remedy.

This case having arisen previous to the adoption of Art. XIV, Section 8, of the Constitution of the State, relative to the rights and powers of married women, must be adjudged according to the law as it stood previous to the adoption of the present Constitution.

Under the view taken, the trustee was guilty of a breach of trust from the time of the transfer of the trust funds, and must account for the same, principal and interest.

A question is presented by the case, whether, in such accounting, allowance should be made to the trustee, by way of discharge, for the value of certain of the mortgaged slaves, freed in the hands of the trustee, by the act of emancipation, and for Confederate money, held by him as the proceeds of the sale of certain other of the mortgaged slaves, that became valueless in his hands at the end of the war. It will be unnecessary to trace the facts in relation to these mortgaged slaves, inasmuch as it nowhere appears that either the slaves, or their value, were ever put in a state of security as part of the trust estate; and, until this was done, in accordance with the terms of the settlement, no ground for a discharge, *pro tanto*, of the trustee, on account of the loss resulting from the breach

of trust, could exist. The decree of the Circuit Court must be reversed. The question of the allowance of interest not having been considered or discussed, will come before the Circuit Court for consideration.

It is ordered, adjudged and decreed, that the decree of the Circuit Court be, in all things, reversed and set aside.

And it is further adjudged and decreed, that the defendant, William C. Dunn, is liable to account to and with the complainants, for the moneys that came into his hands under the order made in the case of Mary Dunn *et al.*, *vs.* Margaret Young *et al.*, dated June 6th, 1853. And that, on such accounting, the said William C. Dunn is not entitled to be allowed, by way of discharge, any amount as the value of slaves freed in his hand by emancipation, nor as the value of Confederate money held by him as the proceeds of any slaves, claimed by him to be a part of the trust estate.

And it is further ordered, adjudged and decreed, that this cause be remanded to the Circuit Court, for such accounting. and for such order and decree as may be requisite to establish the trust estate of the complainants, in accordance with the terms of the said order of settlement, June 6, 1853.

*Moses*, C. J., concurred.